Sherwood
*v.*
Weston.

## SHERWOOD *against* The town of WESTON.

Previous to 1797, a certain bridge in the town of *W.*, made part of an old road leading from one seat of justice to another, through the town of *W.*, which was then liable to maintain it. In the year 1797, a turnpike company, called *F*, was incorporated, passing over the same ground in part, and including such bridge as part of its road. In 1834, another turnpike company, called *C*, was established, whose road passed through *W.* In 1838, the charter of *F* was repealed; and in the repealing act it was provided, that the road of that company should be thereafter a free public highway; and that the towns through which it passed should maintain and keep in repair such portions of it as were situated within their respective limits, with the exception of such part thereof as was included in *C's* road. In an action brought by one who had sustained an injury in passing over said bridge, in consequence of its being out of repair, against the town of *W*, it was held, 1. that it was not the intention of the legislature to discontinue such road as a public highway; 2. that *C* not being in any way a party to the proceeding before the legislature on which the repealing act of 1838 was founded, the liability of that company was not affected thereby; 3. that the incorporation and organization of *F* had no other effect upon the liability of the town of *W* to maintain the old road as it previously existed, than to suspend that liability during the existence of the corporation; consequently, upon the extinction of that corporation in 1838, the liability of the town of *W* revived, unless it appeared that such liability was thrown upon some other person or corporation.

Where the charter of *C* authorized the committee to lay out its road from a certain point on the old road, thence running *Northerly* thereon to a certain other point which was *Southerly* of the bridge, and thence to diverge from the old road, in a direction different from that of its *Northern terminus;* and provided, that the committee should make report of their doings to the county court, which that court should accept, unless they had made mistakes, and then the court should correct such mistakes; the committee in fact laid the road of *C* over that portion of the former one where the bridge was, and their report was returned to and accepted by the county court; it was held, 1. that such committee were not authorized to extend the road of *C* on such former road, then part of the road of *F*, as far *North* as the bridge; 2. that this part of such road did not, by virtue of those proceedings, irrespective of the authority conferred by the charter, legally become the road of *C.*

Where a vote was passed by *C*, soon after the acceptance of such report, and before any thing had been done towards working the road, or opening it for public travel, assuming it, as it had been laid out by the committee agreeable to the charter; and the charter provided, that the damages assessed to individuals through whose land the road should be laid, should be paid before the company should be authorized to make the road; and that the road should be made and put in repair to the acceptance of the commissioners, previous to the erection of toll-gates thereon; and it appeared, that *C* had never done any corporate act on that part of the surveyed road where the bridge was; it was held, that such vote of assumption

did not make the company liable for injuries at this place, in consequence of defects in the road.

Where it appeared that *C* had opened for public travel the *North* end of the surveyed road, and established a toll-gate thereon, pursuant to a legislative resolution passed in 1836 : it was held, that these acts did not make the company liable for injuries on the whole road.

Where the plaintiff in such action offered evidence to prove, that ever since the repeal of the charter of *F* in 1838, the town of *W* had maintained and kept in repair the bridge in question and that part of the former road of *F*, which was within the limits of that town ; it was held, that such evidence was admissible, as showing a recognition by the town of its liability.

*Fairfield,*
June, 1846.

Sherwood
*v.*
Weston.

THIS was an action founded on the statute relating to highways and bridges, to recover damages for an injury which the plaintiff received, by being thrown from his horse, while passing, in the town of *Weston*, over a defective bridge.

The cause was tried, on the general issue, at *Fairfield, February* term, 1846, before *Hinman*, J.

The bridge mentioned in the declaration was within the limits of the town of *Weston*, and was part of an old public road, leading from the town of *Fairfield*, through the towns of *Weston* and *Reading*, (*a*) to *Danbury*. In the year 1797, the General Assembly incorporated the *Fairfield, Weston and Reading Turnpike Company*, whose charter is to be found in *Priv. Stat.* 1266. This company was duly organized, and a turnpike road established pursuant to the charter, which continued to exist, as such, up to the year 1838, when the charter was repealed. The turnpike road thus established, commenced on the old public road, at a point below the bridge in question, and ran upon that road into the town of *Reading*, including this bridge in its course ; and during the continuance of the corporation it continued to be a part of the turnpike road. The *Black-Rock and Weston* turnpike road, as altered in the year 1832, terminated on the old public road at a point about three miles *South* of the point where the *Fairfield, Weston and Reading* turnpike road commenced ;

(*a*) I am glad of this opportunity, as I am of every opportunity that occurs, of restoring, as far as my example will have that effect, the original and correct orthography of the name of this town. The prevalent corruption (*Redding*) is not very flattering to the memory of Col. *Read*, whose cotemporaries deemed his services and benefactions to the new corporation worthy of being held in grateful remembrance, by giving it a name derived from his.

R.

*Fairfield,*
June, 1846.

Sherwood
*v.*
Weston.

thus leaving about three miles of such old road in the town of *Weston*, not included in the limits of either of those turnpike companies. In 1834, the *Fairfield County Turnpike Company* was incorporated ; *(Priv. Stat.* 1262.) and under the charter of that company the committee therein appointed made a survey, and laid out a turnpike road, and reported their doings to the county court of *Fairfield* county, at its term in *November*, 1834, when the report of such committee was accepted. In laying out this road, the committee, commencing at the *Northern* termination of the *Black-Rock and Weston* turnpike road, laid out the *Fairfield County* turnpike road on the old road from such termination to the point where the *Fairfield, Weston and Reading* turnpike road commenced, *Northerly* of the house of *Jesse Wakeman*, mentioned in said charter ; thence, upon the *Fairfield, Weston and Reading* turnpike road, over the bridge in question, for about eighty-two rods ; and thence, leaving the last-mentioned road and diverging from it, to *Meeker's* mills, mentioned in said charter. The bridge, therefore, was, at this time, a part of the *Fairfield, Weston and Reading* turnpike road, and was also embraced, by the laying-out of the committee, in the *Fairfield County* turnpike road.

The defendants denied, that the bridge at this time belonged to them to maintain or repair, or that they were liable to repair it, and insisted that it belonged to the *Fairfield County Turnpike Company*, who were bound to maintain it.

The plaintiff offered in evidence the resolution of the General Assembly, passed in 1836, relative to the *Fairfield County Turnpike Company*, to be found in *Priv. Stat.* 1265. It was proved, and not denied, that the *Fairfield County Turnpike Company* had never worked, or attempted to work, any part of their turnpike road between *Ryan's* mill and its *Southern* termination at the *Northern* termination of the *Black-Rock and Weston* turnpike road. But there was an old road leading from *Ryan's* mill to the *Fairfield, Weston and Reading* turnpike road, at a point *North* of the point at which the *Fairfield County* turnpike road, as laid out by the committee, diverged from the *Fairfield, Weston and Reading* turnpike road ; and the *Fairfield County Turnpike Company* commenced, and mostly finished, the construction of a road from the *Fairfield, Weston and Reading* turnpike road, and inter-

secting the *Fairfield County* turnpike road, as laid out, at *Ryan's* mill; but the road so partly worked was never thrown open for public travel, nor used by the public as a road; nor were any damages ever paid to the proprietors of lands through which it passed.  But the defendants claimed, that this road was authorized by the resolution of 1836; and that the erection of the gate on the *Fairfield County* turnpike road, at a point between *Meeker's* mills and the *Newtown and Norwalk* turnpike road, (as will be presently stated) was tantamount to a laying-out and location thereof, by the commissioners thereon, at the place where it was partly worked; and that whether the erection of such gate was, or was not, a legal establishment of the road as a turnpike road, the defendants claimed, that neither the *Fairfield County Turnpike Company*, nor the plaintiff in this suit, could be permitted to take advantage of said road's not being duly established at said place, under the resolution of 1836.

It was proved and admitted, that the *Fairfield County Turnpike Company*, pursuant to their charter, and to the laying-out and report of the committee, soon thereafter, and many years before the injury complained of, constructed their turnpike road from said point of intersection at or near *Ryan's* mill to *Meeker's* mills; and that it was, at the same time, thrown open for and used by the public, as a public turnpike road; that the company, at the same time, erected a toll-gate thereon, *North* of the road mentioned in the resolution of 1836, and thenceforth collected tolls thereat from travellers; and that the connexion of that part which lay above said intersection near *Ryan's* mill, with that part thereof which lay below the same, was by an old common highway, running from said point of intersection *Westerly* to the *Fairfield, Weston and Reading* turnpike road, and thence down upon the same to the point of divergence above-mentioned.

It was not proved or claimed by the plaintiff, that any thing had been done under the resolution of 1836, by the commissioners on the *Fairfield County* turnpike road; nor that they had ever done any thing to discontinue, or had ever discontinued, the part of said road described in that resolution.

The plaintiff claimed to have proved, that nothing had been paid, by the *Fairfield County Turnpike Company*, to the

owners of the lands over which the road was so constructed, for the damages done to them thereby ; and it was admitted, that no such damages had been paid. It was not shown, that said section of the road of the *Fairfield County Turnpke Company,* so constructed under the resolution of 1836, was ever made or put in repair to the acceptance of any commissioners appointed upon the *Fairfield County* turnpike road ; nor was it shown, that the remainder of this road, had ever been made or accepted, by any such commissioners, otherwise than by the admitted fact that the road above such intersection, at or near *Ryan's* mill to *Meeker's* mills, had been so constructed, thrown open and used, and that said company erected a toll-gate thereon, and thereat collected tolls.

The plaintiff claimed and offered evidence to prove, that the bridge in question and that part of the old road which was embraced in the *Fairfield, Weston and Reading* turnpike road, had been, from the passage of the resolution of 1836, kept in repair, by the overseers of highways and select-men of the town of *Weston ;* and that their accounts of expenditures for such repairs had been laid before that town from time to time, and were by that town accepted and paid.

To the admission of this evidence the defendants objected ; but the court admitted it.

It was proved by the defendants, and admitted by the plaintiff, that at a meeting of the *Fairfield County Turnpike Company,* held on the 6th day of *May,* 1835, that company, in reference to the road so laid out by the committee as aforesaid, passed a vote, of which the following is a copy : " That the company assume the road, as laid out by the committee, agreeable to the charter, whereupon was granted a turnpike, with all the privileges thereof, known by the name of the *Fairfield County Turnpike Company,* upon the application of *Walter Thorpe* and others." It was shown, and not denied, that this company thenceforward held regular meetings, at which officers were appointed and other business of the company was done.

The defendants claimed and offered evidence to prove, that whatever repairs had been made, by the overseers of roads and the select-men of the town of *Weston,* were made under a mistaken impression and belief entertained by them, that by the resolution of 1836, the maintenance of the whole of that

part of the old road lying in *Weston*, which had been embraced in the *Fairfield, Weston and Reading* turnpike road, had been imposed upon that town; and that the repairs were made only because of such impression and belief.

*Fairfield,*
June, 1846.

Sherwood
*v.*
Weston.

The plaintiff thereupon claimed, that under the charter of the *Fairfield County Turnpike Company*, it was not competent to the committee to lay out any part of the road of that company upon the ground occupied by the *Fairfield, Weston and Reading* turnpike road, and that that part of the *Fairfield County* turnpike road on the ground occupied by the *Fairfield, Weston and Reading* turnpike road, was illegally laid out, and never became a part of the *Fairfield County* turnpike road; that neither the acceptance of the report of the committee, nor the vote of the *Fairfield County Turnpike Company*, amounted to such an assumption of the road as to discharge or exonerate the town of *Weston*, (if that town was otherwise liable,) from its liability to maintain and repair the same and said bridge so being thereon; that inasmuch as this company had never made any part of their road below *Ryan's* mill, as it had been laid out by the committee, nor had completed the road below *Ryan's* mill, which they had partly worked as aforesaid, and had never opened any road for public travel below *Ryan's* mill, under the resolution of 1836, they never became liable by law to maintain or repair said bridge; and that the duty of maintaining and repairing that part of the *Fairfield, Weston and Reading* turnpike road, which was within the limits of the town of *Weston*, on the repeal of the charter of the last-mentioned company, was thrown upon, and belonged to, the town of *Weston*. The plaintiff also claimed, that if said bridge was part of the old road from *Fairfield* to *Danbury*, previous to the incorporation of the *Fairfield, Weston and Reading Turnpike Company*, and lay within the town of *Weston*, and that town had, from the repeal of the charter of said company in 1838, assumed the repair thereof, as the plaintiff claimed to have proved, that town was then by law liable to maintain and keep the same in repair, and to pay such damages as the plaintiff had sustained in consequence of its neglect so to do.

These claims the defendants resisted, claiming, that it was competent to the committee to lay out the *Fairfield County* turnpike road as they had done, and that such road was legally

*Fairfield,*
*June, 1846.*

Sherwood
*v.*
Weston.

laid out and became a legal road, the acceptance of said report by the county court being conclusive evidence that this was a legal road; that if the *Fairfield County Turnpike Company* had assumed the road, this company were thereafter bound to maintain it and keep it in repair; and that the bridge in question being thereon, the company were equally bound to maintain and keep that also in repair; that the vote of the *Fairfield County Turnpike Company,* on the 6th of *May,* 1835, was an assumption of said road, and that said company thereby became liable to repair the same, and the bridge thereon; and that the construction by said company of the road above *Ryan's* mill, and the use thereof for public travel thereon, and the setting up a toll-gate thereon and collecting tolls thereat, amounted to an assumption of the road as laid out by the committee, except so far as it had been altered (if altered at all) by the resolution of 1836; and that consequently, said company was, at the time of the injury complained of, liable to maintain said bridge and keep it in repair. The defendants also insisted, that the town of *Weston* was not liable to maintain or repair said road, at the place where said bridge was, by reason of the exception in the resolution of 1838, repealing the charter of the *Fairfield, Weston and Reading Turnpike Company,* by which resolution it is provided, that said towns of *Weston, Reading* and *Danbury* shall maintain and keep in repair such portions of said road as are situated within their respective limits, with the exception of such part thereof as is included in the limits of the *Fairfield County* turnpike road. (*b*)

The court charged the jury, that if they should find, that the plaintiff had received the injury complained of in the declaration, in consequence of the defective condition of the bridge in question, and of its being out of repair, as claimed by the plaintiff; and if they should also find, that previous to the incorporation of the *Fairfield, Weston and Reading Turnpike Company,* in 1797, there was an old highway at the place in question, of which said bridge made a part, and that the town of *Weston* was then by law bound to maintain and keep the same in repair; and if they should also find, that subsequent to the repeal of the charter of that company in 1838, and

(*b*) See Resolutions of 1838, *p.* 61.

from that time to the time of the injury complained of, that town, as such, by its select-men and surveyors of highways, and other inhabitants, had maintained and repaired said road and bridge, and the town had ratified and approved of these acts, and allowed and paid for the services done upon said road and bridge, in the manner claimed by the plaintiff; they would be authorized from these facts to find, that the town had assumed the repair of said road and bridge; and if they should so find, it would be their duty to render a verdict in favour of the plaintiff, notwithstanding the charter of the *Fairfield County Turnpike Company*, and the acts claimed by the defendants to have been done under it.

*Fairfield,*
*June, 1846.*

Sherwood
*v.*
Weston.

The jury thereupon returned a verdict for the plaintiff; and the defendants moved for a new trial, for a misdirection, and for error in admitting the evidence objected to by them.

*Swift* and *Hawley*, in support of the motion, contended, 1. That the town of *Weston*, which ceased to be liable for the maintenance of the bridge in question, when the *Fairfield, Weston and Reading* turnpike road was established, had never since been onerated with that burden. The resolution of 1838, repealing the charter of this company, and subjecting the towns of *Weston, Reading and Danbury* to the maintenance of such parts of the road as were within their respective limits, expressly excepts " such part thereof as is within the limits of the *Fairfield County* turnpike road."

2. That on the incorporation of the *Fairfield County Turnpike Company* in 1834, this bridge became a part of that company's road, and was within the limits thereof, when the resolution of 1838 was passed. What were those limits? Obviously, the road *as laid out*,—as widened by the report of the committee, accepted by the county court. It is agreed that that road, as laid out, embraced this bridge; and the General Assembly must necessarily, in the resolution of 1838, have referred to that part of the *Fairfield County* turnpike road, as actually laid out, which was coincident with the old turnpike road, because no other part of the discontinued turnpike road was embraced in the limits of the *Fairfield County* turnpike road.

It is objected that the *Fairfield County Turnpike Company* never *assumed* their road as laid out. They clearly did

assume it, and explicitly too, by their vote. This was a legal assumption, necessarily subjecting them to all the liabilities incident to an assumption—especially, to maintain and repair. They could never, after that vote, deny that they had assumed the road, nor their obligation to maintain and repair.

Again, it is objected, that the road of the *Fairfield County Turnpike Company* could not legally be laid over any part of the old one. Why not? In the first place, that company could not make such an objection, after their assumption. Secondly, the old turnpike company have made no such objection, here or elsewhere. Clearly, no one else could object. Thirdly, the resolution of 1838 recognizes the fact that the last turnpike road was, to some extent, coincident with the old one. See *Commonwealth* v. *Worcester Turnpike Company*, 3 *Pick.* 327. 329. Fourthly, at the utmost, the question under this objection would be, whether by such laying-out, the rights of the old company were impaired. 7 *Conn. R.* 48. This question was not put to the jury, but was withdrawn from them. Fifthly, the acceptance by the county court was evidence—and conclusive evidence—that the laying-out of the *Fairfield County* turnpike road, was valid. 3 *Pick.* 327.

3. That the fact that the *Fairfield County Turnpike Company* never worked or repaired any part of their road below *Ryan's* mill, as laid out, cannot exonerate them from liability to repair all that lies below. They in fact always used this very part, in connexion with the part above *Ryan's* mill, by means of the cross-road. But if otherwise, they could not discharge themselves of their duty to maintain this part, by their mere neglect to do so.

4. That if the *Fairfield County Turnpike Company* was never liable, the town of *Weston* is not *now* liable; for when the old company went into operation, the liability of the town ceased, and it could never be again thrown on the town, but by some statutory provision. The resolution of 1838 expressly *excepts* this part; and this exception is equivalent to a declaration by the legislature, that the town should not be liable. *Commonwealth* v. *Western*, 1 *Pick.* 136. *Tinker* v. *Russell*, 14 *Pick.* 279.

5. That the town had not, (as claimed by the plaintiff,) voluntarily assumed the road. In the first place, it could not do this, unless in conformity with some law. If the law imposed

no duty, the voluntary, gratuitous act of the town, or of its officers, could impose none. Even an explicit vote of the town to assume the road, would not have been obligatory. *Norton* v. *Mansfield*, 16 *Mass. R.* 48. *Worcester* v. *Eaton*, 13 *Mass. R.* 371. *Stetson* v. *Kempton*, 13 *Mass. R.* 272. But secondly, the facts claimed by the plaintiff did not authorize the finding, or the charge of the court. *Parsons* v. *Goshen*, 11 *Pick.* 396. *Tinker* v. *Russell*, 14 *Pick.* 279. Thirdly, all that the town did, was done under a *mistake*. The doing of an act under the *mistaken notion* that the party is bound to do it, is no assumption of a duty. Fourthly, the question of the town's *intention to assume*, was entirely withdrawn from the jury.

*Booth* and *Loomis*, contra, after remarking, that under our statute relating to Highways and Bridges, *s.* 1. 3. the town of *Weston* was liable to repair this road, and that such liability was suspended forty years, during the existence of the *Fairfield, Weston and Reading Turnpike Company* as a corporation, contended, 1. That by the resolution of 1838, repealing the charter of that company, it ceased to be liable, and the liability was again cast upon the town. The exception in that resolution cannot be so construed as to exempt the town from liability; and the facts and circumstances of the case show that the legislature did not contemplate such exemption.

2. That the *Fairfield County Turnpike Company* never became legally liable to maintain this road. In the first place, the legislature could not interfere with the charter of the old company; and no public interest required it. Secondly, the power to lay the road of the new company over the old turnpike road, was not granted. This is evident from the terms of the charter. *Priv. Stat.* 1263. Thirdly, if the company exercised powers not granted, the acceptance of the report of the commissioners by the county court, imparted no validity to the proceeding. *Fales* v. *Whiting*, 7 *Pick.* 225.

3. That the road in question never became the road of the *Fairfield County Turnpike Company.* The defendants claim that it did; first, because the company, by the vote of *May* 6th, 1835, voted to "assume" the road. This vote imports nothing more than that the company undertook to make the road and keep it in repair, in consideration of the privileges

*Fairfield, June, 1846.*

*Sherwood v. Weston.*

granted. The defendants also found their claim on the fact that a portion of the route surveyed in 1834, has been worked, and a gate erected upon the upper section. This, however, was under the resolution of 1836, which merely dispenses with the necessity of finishing the whole ; and it appears from that resolution, that no part of the road had then been made. *Priv. Stat.* 1265. On the other hand, the plaintiff claims, first, that the requirement of the charter that a company shall " assume," comes in by way of proviso, and is one only of several things required by the charter to be done. *Priv. Stat.* 1263. Secondly, payment of damages assessed, is as necessary as a vote to assume ; and the provision connected with it that the road may be used six months after the formation of the company, shows, that it was to be *used* after the vote to assume. Thirdly, it is apparent from the 7th paragraph of the charter, that it could not become the road of the company until it should " have been made and put in repair." *Priv. Stat.* 1264. *Bliss* v. *Deerfield,* 13 *Pick.* 102. *Drury* v. *Worcester,* 21 *Pick.* 44. *Williams* v. *Hingham &c. Turnpike Corporation,* 4 *Pick.* 341.

4. That the town, with full knowledge of the facts, accepted this road in 1838, and have ever since kept it in repair. The expenditures were made by the *town.* The town accepted and paid the bills. A *mistake* therefore of the overseers and select-men, is immaterial. 2 *Stark. Ev.* 666. citing *Rex* v. *Wadsworth,* 1 *B. & A.* 63. *Commonwealth* v. *Petersham,* 4 *Pick.* 119.

HINMAN, J. The jury having found, in this case, that the injury complained of was received in consequence of the bridge being out of repair, as claimed by the plaintiff, the question now is, whether it appears from the facts found by the jury and shown in the motion, that the town is liable for it.

It is insisted by the defendants, that the town of *Weston* is not liable, first, because this is not a bridge, or any part of a road or highway, which that town is by law bound to maintain ; and, secondly, because the *Fairfield County Turnpike Company* are bound to maintain it.

First, then, is the town liable to maintain the bridge, provided no other person or corporation is shown to be so ? Or

rather, is the town liable, provided the *Fairfield County Turn-pike Company* is not?

The 1st section of the statute referred to, (*Stat. ed.* 1838. *p.* 337.) throws upon the towns the burden of maintaining all necessary highways, roads and bridges, within their limits, which do not belong to any other person or corporation to maintain and keep in repair. Was this a " necessary bridge," within the meaning of this statute ? By a necessary highway or road, as the term is here used, we suppose is meant one which has been established by lawful authority, so that the public have an easement over it, and a right to use it for the purposes of travel : and if the bridge in question, makes part of such public road, it is a "necessary bridge," within the meaning of this statute ; and its necessity is sufficiently shown, when it appears that it is a public bridge, and devoted to the public use as such. Laying out of view, then, for the present, the question as to the liability of the *Fairfield County Turn-pike Company* for this injury, and the facts stated in the motion, so far as they are important to show the liability of the town, are, that previous to 1797, the bridge made part of the old road leading from *Fairfield,* through *Weston* and *Read-ing,* to *Danbury;* and being in the town of *Weston,* that town was then liable to maintain it ; that in the year 1797, the *Fairfield, Weston and Reading Turnpike Company* was in-corporated, and that part of said old road which includes the bridge, became a part of that company's turnpike road, and so remained until 1838, when the charter of that corporation was repealed ; since which time, the town of *Weston* have main-tained such parts of the road of that company as are within the limits of the town ; consequently, they have maintained the bridge in question. On the repeal of the charter of this company, the legislature did not intend to discontinue, as a public way, any part of the road which had before been main-tained by that corporation. So far is this from the fact, that it is expressly provided in the repealing resolution, "that the said road shall hereafter be a free public highway ; and the towns of *Weston, Reading* and *Danbury* shall maintain and keep in repair such portions of it as are situated within their respective limits, with the exception of such part thereof as is included in the limits of the *Fairfield County* turnpike road." The bridge, being in the town of *Weston,* it is obvious, that it

must have been left, by this resolution, either a free public highway, with the liability to repair it thrown upon the town; or it must have been a part, actual or legal, of the road of the *Fairfield County Turnpike Company;* and in either event, it is equally clear, that it was not the intention of the legislature to discontinue it as a public way. If it was not a part of that company's road, it was the intention that it should be supported by the town, as a common highway. If it was within the limits of that company's road, then it was the intention to leave the burden of maintaining it to that corporation; and in this respect, it could make no difference, whether it was within the legal limits of the *Fairfield County* turnpike road, or not. If it was within its actual limits, or was supposed to be so by the legislature, it is equally clear, that it was not the intention to discontinue it as a public way.

Again, it was not the object of the exception in the resolution of 1838, to define or extend the limits of the *Fairfield County* turnpike road; or to sanction or legalize a laying-out, which was not authorized by their charter, or to exempt the town from liability to repair any part of the road, which it was provided should remain open for public accommodation. The exception, therefore, cannot be so construed as to affect, in any way, the liability of the *Fairfield County Turnpike Company.* That company was no party to, and had no notice of, the proceeding before the legislature; and we cannot be so disrespectful to that body as to suppose they could have intended to affect their rights or liabilities, by any proceedings relating to another corporation in which they had no interest or concern.

What then was the effect of the repeal of the charter of the *Fairfield, Reading and Weston Turnpike Company* upon the liability of *Weston* to maintain this bridge, without, at the same time, discontinuing their road as a public way?

To determine this, we do not think it at all necessary to enter into the question, as to the effect of repealing the charter of a turnpike company whose road had never been supported by the towns as a common highway. In such a case even, if as we suppose, it is competent for the legislature directly to lay out, establish, or discontinue highways at pleasure, and there was such a provision in the repealing resolution, as there is in this case, in the resolution of 1838, it would seem that the

*Fairfield,*
June, 1846.

Sherwood
*v.*
Weston.

burden of maintaining, as a common highway, the discontinued turnpike road, would be thrown upon the towns within whose limits it lay. But we do not put the case upon this ground; because we think, that the incorporation and organization of the *Fairfield, Reading and Weston Turnpike Company* had no other effect upon the liability of the towns to maintain the old road, as it previously existed, than to suspend that liability during the existence of the corporation.

When a highway is once established, it remains a highway until discontinued. The legislature may discontinue it; (*Wales* v. *Stetson,* 2 *Mass. R.* 143.) and if it becomes useless, in consequence of the laying-out of a turnpike road, that is a good cause of discontinuance. *Commonwealth* v. *Roxbury,* 8 *Mass. R.* 457. And if there is any thing in the charter, or in any alteration of it, to show an intention to discontinue it, courts would give such intention full effect. Hence, during the existence of the corporation in this case, the liability of the towns to maintain this road was suspended, or what is the same thing, the highway, as a town highway, was discontinued for the time; because it is apparent, that the legislature could not have intended, that a liability to repair the same road should rest upon the towns and the turnpike company, at the same time. But this was not such a discontinuance as to take away or destroy, on the repeal of the charter, the right of way which the public had acquired, and discharge the land of the easement; and the reason is, because there has been nothing to show that such was the intention of the legislature: on the contrary, the resolution of 1838, shows a manifest intention that it should remain a public road. Had the corporation been created for a term of years, instead of an unlimited period, we do not suppose the old highway would have been so discontinued that it would not revive again, on the expiration of the charter. During the existence of the corporation, the liability of the towns would cease, or rather, would be transferred from the towns to the turnpike company; but would revive again, when the corporation expired. But if such would be the effect in the case of a charter limited for a term of years, the same effect ought to follow in the case of the repeal of an unlimited charter, provided there is the same —reason for it.

Assuming, then, that there is a highway, of which the

bridge in question forms a part, it follows, of course, that the town of *Weston* must maintain it, unless it is shown to belong to some other person or corporation to do so. Have the defendants shown, that it belongs to the *Fairfield County Turnpike Company* to do this?

Here, a question arises upon the charter of this company. Does this authorize the laying-out and establishing another turnpike over ground covered by the road of the *Fairfield, Reading and Weston Turnpike Company?* This charter, which was granted in 1834, four years before the *Fairfield, Reading and Weston Turnpike Company's* charter was repealed, authorized the committee to survey and lay out a road, "running the same from the *Northerly* end of the *Black-Rock and Weston Turnpike*, on the *old road*, to a convenient point *Northerly* of the dwelling-house of *Jesse Wakeman* in said *Weston.*" Now, in looking at the then existing state of things, for the purpose of determining where, by these words, the legislature directed or authorized this last turnpike road to be constructed, we find, that there was in fact a few miles of the old *Danbury and Fairfield* road left here, not covered by any other road, with the dwelling-house of *Jesse Wakeman* upon it; and that its *Southern* termination was the *Northerly* end of the *Black-Rock and Weston* turnpike road, where the new turnpike road was to commence, and its *Northern* termination was the *Southerly* end of the *Fairfield, Reading and Weston* turnpike road, some distance *North* of said *Wakeman's* dwelling-house. Under these circumstances, the committee, in surveying the new turnpike road, are directed to commence at the *Southerly* termination of this piece of old road, or, what is the same thing, at the *Northerly* end of the *Black-Rock and Weston* turnpike road, and run up, on the old road, to a convenient point, *Northerly* of the dwelling-house of said *Wakeman;* and there they are to diverge so as to go to *Newtown.* This, we think, did not authorize the committee to lay the new turnpike road on the ground covered by the old one. It confined them to the old road, and fixed the point from which they were to diverge, on this old road, and *North* of said *Wakeman's.* And as the bridge in question was still *North* of this, on the *Fairfield, Reading and Weston* turnpike road, they therefore had no right to extend the new turnpike road over it.

But to this it was said, that it was all " old road" from *Fair-*
*field* to *Danbury*, and had been so from some time previous to
1797.   That there was, anciently, an old road from *Fairfield*
to *Danbury*, which has ever been a public travelled way, is
true.   But it is also true, that most of it, indeed all of it, we
believe, except the little piece upon which this turnpike road
was directed to be laid, had, for many years, been converted
into one or the other of the turnpike roads, which, we have
seen, terminated upon it ; and after it had become turnpike
road, it was as distinguishable, in common acceptation, from
the old road, as applied to that part of it not converted into
turnpike road, as are any other two different objects which
bear a like resemblance to each other.   Had any one ac-
quainted with these localities been asked, where Mr. *Wake-*
*man* resided, the answer might, and probably would have
been, upon the old road ; but if inquired of, where the bridge
in question was situated, the answer would have pointed to
the turnpike road, of which it made a part.   The legislature
doubtless used the words in their common and ordinary ac-
ceptation.   We see nothing to show that any thing different
was intended ; and unless there is some reason for so doing,
we cannot construe them in any other than their common and
popular sense.   The legislature, then, did not intend, that the
new road should be laid on ground covered by the road of
another turnpike company.   There was no reason why it
should be.   There was then in existence a corporation having
the same powers, subject to the same liabilities, in regard to
the road, which the new company would have and be subject
to, if permitted to extend their road over it.   And while we
do not feel called upon to deny the power of the legislature to
authorize the new corporation to extend their road over
another turnpike road, upon making a just compensation ; yet,
we do feel authorized to say, that in a case where no reason
exists for it, the taking of a part of the franchise of one turn-
pike company, and converting it to the use of another com-
pany, having the same general objects, and accomplishing
them by the same or similar means, without any increase to
the facilities of the public travel, or the means of accommoda-
ting it, will not be presumed.   We should require language
free from ambiguity, before we should be authorized to say,
that the legislature had been engaged in such needless, not to

*Fairfield,*
June, 1846.

Sherwood
*v.*
Weston.

say trifling legislation, as the incorporation of two turnpike companies for the purpose of maintaining the same road.

But again, it is said, that inasmuch as the committee did in fact lay the new turnpike road over that portion of the former one where this bridge was; and as their report was returned to and accepted by the county court; it thereby became a part of the new turnpike road, irrespective of the authority conferred by the charter. The charter of the new company, after providing for the surveying and laying-out of their road by the committee, and the report of the proceedings to the county court, then directs, that "said court shall accept said report, unless it be made to appear, that said committee have not given the notice above required, or have acted corruptly, or have made mistakes upon their own principles, which mistakes said court may correct. We do not see in this, any power given to the county court to dispense with the requirements of the charter in regard to the location of the road. No doubt the county court might have rejected the report for not conforming to the required location; and had the difficulty now discovered been brought to the notice of the court, we have no hesitation in saying, that it would have been its duty to see that the mistake was corrected before accepting the report. But this did not authorize that court, or any other, to dispense with the requirements of the charter, in regard to the location of the road. The road was directed to be run from a a point in *Weston* to another point in *Brookfield*. Could the county court, by accepting such a report, have legalized a laying-out, under this charter, of a road running from *Fairfield* to *Stratford*, or between any other two towns in the state? If this could not be done, because the charter does not authorize it; neither does it authorize the laying of the road on ground covered by another turnpike; and the acceptance of the report by the county court, could have no greater efficacy in the one case than in the other. If this laying-out could be legalized, by the acceptance of the report, we do not see why the laying of a road in any part of the state, might not, upon the same principle, be legalized. But no such authority as this was conferred upon the county court; and the action of that court, therefore, is of no validity, as to so much of the road as was laid upon ground not authorized by the charter. *Fales* v. *Whiting,* 7 *Pick.* 230.

But there is another difficulty, which is also fatal to the claim that the *Fairfield County Turnpike Company* was liable to maintain this bridge. An examination of the motion will show, that this company has never done a single corporate act on any part of their surveyed road *South* of *Ryan's* mill. There was indeed a vote, passed at the first meeting of the company, in *May*, 1835, soon after the acceptance of the survey of the road, by the county court, but before any thing had been done towards working or opening it for public travel, " that the company assume the road as laid out by the committee, agreeable to the charter." And the defendants insist, that this is such an assumption of the road as releases the town from all liability in regard to it, and casts it upon this corporation.

*Fairfield,*
June, 1846.

Sherwood
*v.*
Weston.

The time when this vote was passed, before any thing had been done towards making a road, shows, that it was intended for nothing more than a mere acceptance of the charter and of the road as laid agreeable to it ; and perhaps, an agreement that the company would, in a reasonable time, make and open the road in conformity to the laying-out. Such an assumption does not make the company liable for damages incurred in consequence of its not being kept in repair. It might, and probably would, subject the company to indictment or information, if they did not make the road in a reasonable time thereafter ; but it is not opening the road for the purpose of accommodating the public with a way. In *Bliss* v. *Deerfield*, 13 *Pick.* 102. it was decided, that a town is liable for an injury occasioned by a defect in a highway, from the time when it is opened for public travel. And again, in *Drury* v. *Worcester*, 21 *Pick.* 44. the same principle is recognized ; and the court say, that " whenever they suffer a highway to be opened for public use, and to be actually used by the public, the town becomes responsible for its safe condition." This, we think, a much more reasonable rule, than that contended for by the defendants ; which would subject the company to damages for an injury incurred in passing through enclosed fields, before a single act had been done towards making the road : and we do not feel authorized to adopt a rule, which, in many cases, would exonerate towns, and leave for a time no responsibility any where, either for the non-repair of the road, or for damages incurred in consequence thereof.

This view of the subject is confirmed, by a reference to the charter of this company. It is provided, in one part of the charter, that the damages assessed to individuals, through whose lands the road should be laid, should be paid, before the company would be authorized to make the road. And again, it was only after the road should have been made and put in repair to the acceptance of the commissioners, that it was made lawful for the company to erect toll-gates." Surely, the legislature did not intend to establish a mere paper turnpike road, and subject the company to damages for injuries accrued before it could be put in repair, or toll-gates could be erected. Such a turnpike road could answer no other purpose than to shield towns from liability to repair such parts of their common highways as it might pass over. Nor was it intended to leave a mere paper responsibility upon a partially organized corporation, never to be fruitful in any thing but injuries to travellers having occasion to pass over it. But it was not intended, by the statute relating to highways, that a responsibility should not somewhere exist for injuries caused in consequence of defects in all our roads.

Again, it is said, that the opening for public travel of the *North* end of the new turnpike road and establishing a toll-gate thereon, makes the company liable for the whole road.

If that part of the road, as surveyed, which lay between and connected this bridge with the turnpike at and above *Ryan's* mill, had been worked and opened, so as to have found a traveled way through the whole extent of the new turnpike road, there would have been some foundation in this claim. At any rate, it would have presented a fair question for the jury, whether the company had not, in fact, opened for public travel their whole road, though nothing had been done upon that part of it which was old highway. But, when we find, that not a single corporate act has been done on any part of the surveyed road *South* of *Ryan's* mill; and that a large part of it, next to said mill, by which this old highway is connected with that part of the new turnpike road which has been worked, is now included in enclosed fields, with nothing done towards making or opening it as a road; we see no foundation for any question for the jury upon this part of the case, even had the defendants claimed that the new company had opened their whole road, and asked the court to submit

that question to them, which they do not appear to have done. Besides, by the resolution of 1836, (*Priv. Stat.* 1265.) the company were authorized to erect one whole or two half gates on the *North* part of their turnpike road, whenever it was made from its *Northern* termination to the *Newtown and Norwalk* turnpike road; and when it was made from that point to the *Fairfield, Reading and Weston* turnpike, they had the right to erect one other whole or two half gates on the *Southern* part of it. By this resolution, therefore, the turnpike road was in fact divided into two parts; and it might well be, that the company, having complied with the requirements of their charter in regard to the *Northern* part, and having opened that part for public travel, they would have a right, by the terms of this resolution, to erect toll gates on it; and would also be liable for damages incurred in consequence of its not being kept in repair, when they would not be, upon the *Southern* part of their road.

The court below admitted evidence to show, that ever since the repeal of the *Fairfield, Reading and Weston Turnpike Company's* charter, in 1838, the town of *Weston* had maintained and kept in repair the bridge in question, and that part of said company's turnpike road, which was within their limits.

We see nothing objectionable in this. It has been long settled, that the existence of a highway may be proved by immemorial usage, or by dedication of the road to the public use, as well as by the record of the original laying-out. 2 *Greenl. Ev. sec.* 622. and authorities cited. And in the case of proof of a road by dedication, not only the dedication must be shown, but also the acceptance of the road on the part of the public. *Ib* And we know of no more satisfactory proof of such acceptance, where there is no record evidence of it, than the fact that the public have worked and kept the road in repair, and constantly traveled over it as a way. We believe this is the ordinary proof resorted to, in such cases. In 2 *Stark. Ev. p.* 381. (ed. of 1834.) it is said, that proof of the repair of a road by a parish, is strong evidence to show, that it is a public highway. And in *Rex* v. *Wandsworth,* 2 *B. & Ald.* 63. which was an indictment against the parish, for neglecting to repair a highway, and the only evidence that any

*Fairfield,*
*June, 1846.*
———
Sherwood
*v.*
Weston.

Sherwood
*v.*
Weston.

such highway existed, was the fact, that the parishioners had used it for carting gravel from pits on *Wandsworth* common ; and one of the parishioners had turned an arch over a slough, and another had for eleven years compounded his statute duty by repairing a part of it ; though the jury found a verdict for the defendants, yet the court, thinking the verdict against the weight of evidence, stayed the proceedings, in order to prevent the judgment being used as evidence in another prosecution against the parish.   And Lord *Ellenborough* said, that had the question depended on the evidence of user of the road, he should have been unwilling to grant the indulgence ; but inasmuch as there was evidence of both user of it as a highway and also of repairs, the indulgence was granted.   The repair of the road by the town, shows, that they recognized their liability, and put the same construction upon the resolution of 1838, that we have put upon it.

It was claimed, that the court erred, in rejecting the evidence offered by the defendants, to show that the repairs made by the town, were made under a mistaken impression, that the burden of maintaining the road had been imposed upon the town by the resolution of 1838.   If the views we have taken, in regard to the effect of the repeal of the first turnpike charter, are correct, the evidence, if admitted, only shows, that the officers of the town, instead of committing any mistake, took the same view of the liability of the town, which we have taken ; and in any event, therefore, the evidence was wholly immaterial.

Upon the whole, then, we do not see, that any error intervened on the trial below ; and we do not advise a new trial.

In this opinion the other Judges concurred.

New trial not to be granted.